**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No: 22-cr-00344 (DLF)** |
| | : | |
| **v.** | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | |
| **IAN ROSS HORVATH,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Ian Ross Horvath to 30 days' incarceration as part of a period of 36 months' probation, 60 hours of community service, and $500 in restitution.

**I.       Introduction**

Defendant Ian Ross Horvath, a 29 year-old laborer from Plymouth, Indiana, participated in the January 6, 2021, attack on the United States Capitol — a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1]      The Statement of Offense in this matter, filed on January 23, 2023 (ECF No. 72 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs. As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol were $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Horvath pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence that includes 30 days' incarceration as part of a period of 36 months' probation is appropriate in this case because, by his own admission and based on photographic evidence, he  (1) arrived at the West Front of the U.S. Capitol Building when violent activity was taking place around the Capitol between rioters and police officers and, while observing that activity, raised his right fist into the air and joined a chorus of other rioters chanting, "USA, USA, USA"; (2) passed broken-down barriers and walked up steps near the scaffolding erected on the West Front of the Capitol to reach the Senate Wing Doors; (3) with his cell phone in his hand and recording his journey, entered the Capitol through those doors at approximately 2:18 p.m., only five minutes after those doors were first breached by other rioters; (4) traveled from the Senate Wing foyer to the Crypt, where he remained for at least four minutes; (5) climbed a staircase that led him to the Rotunda, where he remained for approximately 20 minutes; (6) returned to the Senate Wing Doors foyer at 2:47 p.m. and stood and watched as police officers attempted to block other rioters from entering the Capitol; (7) exited the Capitol through the Senate Wing Doors at 2:50 p.m. Even though he didn't personally engage in violence or property destruction during the riot, as he exited the Capitol, Horvath motioned with his hand for other rioters to enter the Capitol, stating to them, "come on in, all are welcome"; (8) streamed his activities inside and outside the Capitol via Facebook Live and used Facebook Messenger to communicate with someone he met near the scaffolding on the grounds of the Capitol; and (9) deleted all of his posts, photos, and videos from his Facebook account.

The Court must consider that Horvath's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt Congressional proceedings. But for his

actions alongside so many others, the riot likely would have failed to disrupt the certification proceedings.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 14 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions — from the most mundane to the most violent — contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Horvath's conduct and behavior on January 6.

### *Horvath's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Horvath (encircled in red), wearing a tan vest with fur-like trim, boots, and a fur hat with a raccoon style tail attached, stood atop media boxes on the west front of the Capitol as rioters clashed with police officers. *See* Exhibit 1.[2]

---

[2]      Youtube @Nigrotime https://www.youtube.com/watcj?v=f80ScBHnNRk at 3:14.

Exhibit 1



He also raised his right fist into the air and joined a chorus of other rioters chanting, "USA, USA, USA." *See* Exhibit 2.[3]

Exhibit 2



At 2:15 p.m., Horvath ascended the staircase on the west front of the Capitol, north of the scaffolding, and stood atop a wall and again raised his right fist into the air. *See* Exhibit 3.

---

[3]        Youtube @Nigrotime https://www.youtube.com/watcj?v=f80ScBHnNRk at 8:56.

Exhibit 3



Horvath traveled to the Upper West Terrace and Senate Wing doors and entered the Capitol through the Senate Wing doorway at approximately 2:18 p.m. ET (19:18:48 GMT), holding a cell phone in his right hand consistently with filming his movements. *See* Exhibits 4 and 5.  That was approximately five minutes after that door was first breached by other rioters.

Exhibit 4



Exhibit 5



Horvath left the Senate Wing foyer and entered the Crypt at approximately 2:25 p.m. ET.

*See* Exhibit 6.

Exhibit 6



From the Crypt, Horvath traveled in the direction of the Memorial Doorway to reach the Rotunda. *See* Exhibit 7.

Exhibit 7



Horvath remained inside the Rotunda for approximately 20 minutes. *See* Exhibits 8 and 9.

Exhibit 8



Exhibit 9



Horvath then returned to the Crypt, where he was captured by an unidentified photographer standing next to members of a militant group known as the Oath Keepers. *See* Exhibit 10.

Exhibit 10



At approximately 2:47 p.m., Horvath returned to the Senate Wing foyer, arriving when police officers, including U.S. Capitol Police Officers, were trying to block other rioters from entering the Capitol Building. *See*  Exhibit 11.

Exhibit 11

Camera 0102
Approx. Time:1447
Clip Time: 01:18
File Name: 0102USCS01SenateWingDoornearS139_2021-01-06_14h47min08s147ms.mp4



As Horvath returned to the Senate Wing foyer, rioters overran the police officers and poured through the breached Senate Wing doors, the same doors that Horvath had used to illegally gain entry to the Capitol Building. *See* Exhibits 12 and 13. Rather than exiting through the Senate Wing doors, Horvath took advantage of the opportunity to watch and record video of the officers being overrun by other rioters for several minutes as he remained inside the Senate Wing foyer.

Exhibit 12

Camera 0102
Approx. Time:1447
Clip Time: 03:44
File Name: 0102USCS01SenateWingDoornearS139_2021-01-06_14h47min08s147ms.mp4



Exhibits 13 and 14

Camera 0102
Approx. Time:1447
Clip Time: 03:44 – 08:44
File Name: 0102USCS01SenateWingDoornearS139_2021-01-06_14h47min08s147ms.mp4





At approximately 2:50 p.m., after remaining inside the Capitol Building for approximately 40 minutes, Horvath exited the building through the Senate Wing doorway. *See* Exhibit 15. And, as he exited, Horvath motioned to people to enter the Capitol and stated, "come on in, all are welcome."

Exhibit 15



Horvath's Voluntary Statements to the FBI

On September 14, 2021, Horvath contacted the FBI National Threat Operations Center and the Indianapolis Division of the FBI, identified himself as the individual depicted in images posted on the FBI's U.S. Capitol Violence Most Wanted website, and indicated that he wished to speak with someone regarding his involvement in the January 6th riots at the United States Capitol. Horvath met with FBI agents on September 22, 2021 and reiterated to the agents that he was one of the persons on the FBI's website and confirmed that he attended the January 6 riot.

Horvath stated that he and an acquaintance drove from Indiana to Washington, D.C. to attend then President Trump's "Stop the Steal" rally at the Ellipse near the White House. After attending the rally, Horvath joined a group that had decided to walk to the U.S. Capitol. After

stopping at the Peace Monument on the grounds of the U.S. Capitol, Horvath walked past broken-down barriers and moved to the northwest side of the Capitol building. Horvath observed that rioters were engaged in confrontations with police officers.

Horvath walked up the stairs near the scaffolding to reach the Capitol Building. When he reached the building, the doors on the West front had been breached. He walked into the building and followed the crowd to a circular column area with paintings on the walls, north of the Rotunda, then ascended a staircase to reach the Rotunda. Horvath stated that he left the building after seeing other protestors try to break doors.

Horvath advised agents that he streamed some of his activities inside the Capitol and on the grounds of the Capitol on his Facebook live account. He further advised that he used Facebook Messenger to communicate with a friend that he met with on the ledge near the scaffolding on the grounds of the Capitol Building about his activities. He subsequently deleted evidence of his presence at the Capitol on January 6 from his Facebook account.

On January 20, 2022, Horvath was again interviewed by FBI agents about his potential association with members of the Oath Keepers, which Horvath denied. However, Horvath recalled seeing individuals in military-style clothing assaulting and harassing police officers at the Capitol. He described his recollection of a scene near a staircase inside the Capitol where a mob surrounded a police officer and were belligerently offensive toward the officer. At the time, Horvath stated that the officer was winded and breathing heavily and he was concerned that the officer was going to have a heart attack. Horvath stated that he told the officer, "I'm not here to harm you." Afterward, Horvath stated that he departed the area because he did not believe the officer was in any danger.

*The Charges and Plea Agreement*

On July 28, 2022, Horvath was charged in a Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 17, 2022, he voluntarily turned himself into law enforcement agents in Indiana for processing by the FBI. On October 28, 2022, the United States charged Horvath in a four-count Information with violating the same four offenses. On January 23, 2023, pursuant to a plea agreement, Horvath pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Horvath agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Horvath now faces sentencing for the single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Horvath faces up to six months of imprisonment and a fine of up to $5,000. Horvath must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as

described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days' incarceration as part of a period of 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Horvath's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Horvath, the absence of violent or destructive acts is not a mitigating factor. Had Horvath engaged in such conduct, he or she would have faced additional criminal charges.

Horvath approached the U.S. Capitol Building after other rioters tore down barriers and while rioters were confronting police officers on the west front of the Capitol. As he witnessed clashes with police officers and stood atop media boxes and a ledge on the Upper West Terrace, Horvath repeatedly raised his right fist into the air and chanted "USA, USA, USA." He effectively served as a cheerleader for the chaos and violence occurring in his midst. Then, following at least one of those rallying cries at 2:15 p.m., Horvath gained access to the Upper West Terrace of the Capitol and entered the Capitol Building at approximately 2:18 p.m. through the Senate Wing doors, just five minutes after they were first breached.

As he entered the Capitol and traveled from the Senate Wing foyer, to the Crypt and Rotunda, and back to the Senate Wing foyer, Horvath recorded his movements with his cell phone and streamed to his Facebook Live account. He remained inside the Capitol for about 40 minutes.

15

Following his criminal activities, Horvath voluntarily contacted the FBI and admitted his involvement in the January 6 riot to FBI agents after he observed his image on the FBI's Most Wanted website. He immediately accepted early responsibility for his actions and participation in the riot. He acknowledged that he had destroyed evidence. Horvath's counsel quickly informed the government that he would accept the plea offer provided by the government.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence to include 30 days of incarceration and 36 months' probation.

### B.  Horvath's History and Characteristics

Horvath is a 29-year-old man. *See* ECF 15 ("Presentence Report" or "PSR") ¶ 31.  He completed high school in 2012.  PSR ¶ 41.  Since July 2020, he has been employed by Michiana Contracting in their highway division as a laborer. *Id*. at ¶ 43. As set forth in the PSR, his criminal history includes only a misdemeanor offense for unlawful use of private land without consent while hunting when he was 21 years old. He pled guilty and was fined. *Id.* at ¶ 26. Additionally, while also 21 years old, he was charged with a misdemeanor offense of knowingly or intentionally visiting a common nuisance. He entered into and fulfilled a pretrial diversion agreement. PSR ¶ 28. He does not appear to have a drug or alcohol problem. *Id*. at ¶¶ 39-40. The PSR does not suggest that the defendant was mentally and/or emotionally incapable of avoiding his criminal conduct; instead, he chose to engage in criminal conduct.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While Horvath has admitted that he engaged in criminal conduct on January 6, his failure to appreciate the wrongfulness of his conduct on that date as he observed confrontations by other rioters with police officers on the west front of the Capitol and when he entered the Capitol Building – particularly after witnessing violent clashes by other rioters with police officers – suggests the need for some specific deterrence in this case.

17

Furthermore, Horvath's chants of "USA, USA, USA …" on January 6 also demonstrate the need for specific deterrence. He boldly stood atop media boxes and a ledge on the west front of the Capitol on January 6 and attempted to rally other rioters with his chants. Once he returned to the Senate Wing foyer, after exploring the Crypt and Rotunda filled with other rioters, Horvath stood by and watched as police officers valiantly and unsuccessfully attempted to prevent other rioters from entering the Capitol, then motioned to other rioters to enter the Capitol and falsely stated, "come on in, all are welcome."

Horvath's lack of a serious criminal record, his acceptance of responsibility and quick surrender to authorities suggest that a significant period of incarceration is not necessary to deter him from future criminal activity. However, Horvath's actions and words suggest that the recommended period of incarceration is warranted.  This recommended sentence will hopefully serve to impress upon Horvath and others like him that they cannot illegally cause the disruption that occurred at the Capitol on January 6, stomp upon a legitimate democratic process, and fail to abide by the principals and law that holds this country together.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Horvath based on his own conduct and relevant characteristics, but should

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Horvath has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing inside the Capitol, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity

among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, in which the defendant pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) and faced sentencing for that offense, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

1.      In *United States v. Panayiotou,* 22-cr-55 (DLF), the defendant entered the Capitol a few minutes after Horvath, approximately 10 minutes after it was breached. He similarly traversed the Capitol building and remained inside the Capitol for approximately 39 minutes. While inside the Capitol, he stood near an exterior window and appeared to beckon other rioters to enter the Capitol Building. At one point, Panayiotou was stopped by multiple armed law enforcement officers. Rather than immediately leave the Capitol through the first exit he saw, Panayiotou ventured into the Rotunda before finally departing. After leaving the Capitol, he got rid of some distinctive clothing he wore on January 6 and deleted items from his cellular telephone. Panayiotou violated the conditions of his release in this case by testing positive for marijuana three times, once after judicial admonishment. Panayiotou also failed to show remorse for his activities. Like Horvath, he pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). This Court sentenced Panayiotou to 14 days' intermittent confinement, as a condition of 36 months' probation. The Court also imposed a $1,500 fine and ordered the defendant to pay the agreed upon amount of restitution.

2.      In *United States v. Matthew Webler,* 21-cr-741 (DLF), the defendant traveled past unmistakable signs of violence and entered the Capitol. Inside the Capitol, he cheered and celebrated the breach, singing "Happy birthday to me," and, when exiting, shouted to his fellow

rioters, "Woo, 1776." He also posted his activities to his Facebook account. Like Horvath, he pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Based on his criminal conduct and criminal history (11 prior convictions), this Court sentenced Webler to 45 days' incarceration.

3.　　　In *United States v. Jacob Garcia*, 22-cr-118 (DLF), the defendant yelled at police officers outside of the Capitol stating, "What y'all scared of"; scaled the walls outside of the Capitol using repurposed metal fencing; and, encouraged rioters to enter the building, stating to rioters on the lower west terrace, "If you're not going, get out" and yelling "get in here" and "come on" to rioters as he entered the Senate Wing Door. Garcia was inside the Capitol for approximately one hour and traveled through the Senate Wing, the Crypt, the House Wing, the Hall of Columns, the Rotunda, upstairs in a Senate office hallway, and then back to the Rotunda and out the Memorial Doors. He encouraged rioters to push past police officers, chanting "this is our house," "what we scared of . . . big boys (police officers) up here," "who's house, our house", and directed rioters to move against police officers, yelling, "we need people," "get in here," and "come on" as he directed rioters toward a police line. He also boasted about his activities when he posted to Facebook. He too pleaded guilty to violating 40 U.S.C. § 5104(c)(2)(G). This Court sentenced Garcia to 30 days' intermittent confinement, to be served for 15 weekends during the first year of a two-year period of probation.

4.　　　Finally, in *United States v. Buhler,* 21-cr-510 (CKK), the defendant ignored several red flags upon entering the Capitol Building, including the sounds of flashbangs being detonated, the plumes of smoke clouding the West Front of the Capitol Building, rioters climbing the scaffolding and tearing down the white tarp covering the northwest staircase, and shards of glass scattered on the ground outside the Senate Wing Door. The defendant entered the Capitol and cheered as rioters physically crushed police officers at the East Rotunda Doors. The defendant also

deleted photographs from her phone documenting her time inside the United States Capitol. The Court sentenced the defendant to 30 days' incarceration, followed by 36 months' probation.

These cases demonstrate the need to impose periods of incarceration where a defendant has overtly encouraged the January 6 riot, rallied other individuals outside the Capitol, and encouraged rioters to illegally enter the Capitol. Although he voluntarily presented himself to FBI agents in September 2021, he has demonstrated little if any remorse for his conduct on January 6 and, at his initial plea hearing on January 9, 2023, Horvath had difficulty acknowledging his criminal conduct notwithstanding the executed guilty plea agreement and statement of offense.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[5]

---

[5] Although other judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses, this Court has rejected that view. *See United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).See, e.g., 18 U.S.C. § 3561(a)(3).

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence defendant Horvath to 30 days' incarceration as part of a period of 36 months' probation. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his criminal activity.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ Anita Eve
Assistant United States Attorney
PA Bar No. 45519

---

On the other hand, this Court and others have concluded that it has authority to impose a term of incarceration as a condition of probation under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. *See Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)). The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## **CERTIFICATE OF SERVICE**

On this 4th day of May 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ Anita Eve
Assistant United States Attorney
PA Bar. No. 45519